58 CCPA

**Application of Walter E. DONALDSON, Deceased, by Elsie Donaldson, Legal Representative, and Beverley H. Van Horne.**

**Patent Appeal No. 8358.**

United States Court of Customs and Patent Appeals.

Feb. 11, 1971.

Bruce M. Kanuch, Midland, Mich., attorney of record, for appellant. Glwynn R. Baker, Midland, Mich., of counsel.

S. Wm. Cochran, Washington, D. C., for the Commissioner of Patents. Jere W. Sears, Washington, D. C., of counsel.

Before RICH, ALMOND, BALDWIN and LANE, Judges, and NEWMAN, Judge, United States Customs Court, sitting by designation.

BALDWIN, Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the rejection of claims 10–15, the only claims remaining in appellants' application,[1] as obvious under 35 U.S.C. § 103 in view of the prior art.

THE INVENTION

The subject matter at issue relates to a method of nondestructive testing of such pressure vessels and pipes as exhib-

---

1. Serial No. 350,632, filed March 4, 1964, for "Non-Destructive Testing of Structures" (designated a continuation-in-part of Serial No. 59,748, filed September 30, 1960).

it elastic deformation on being subjected to the distending action of a substantially incompressible fluid. It is adequately defined by and readily understood through a reading of the claims on appeal.

Claim 10, which we have decided is representative, reads [with obvious errors in the record copy corrected]:

10. In a method for non-destructive testing of a pressure vessel which exhibits elastic deformation on being subjected to the distending action of a substantially incompressible fluid, including the steps of introducing a substantially incompressible fluid into the interior of a fluid-filled vessel, thereby increasing the internal pressure within said vessel above the ambient pressure on said vessel and monitoring the increase of the pressure within said vessel as a function of the quantity of fluid introduced therein, the improvement which comprises:

(a) substantially instantaneously determining the pressure inside said vessel and the quantity of said fluid introduced into said vessel;

(b) substantially instantaneously noting that pressure inside said vessel at the first point where the pressure inside the vessel no longer advances proportionally to the increase in the quantity of fluid introduced into said vessel thereby substantially instantaneously detecting the elastic limit [2] of said vessel; and

(c) substantially instantaneously discontinuing the introduction of said fluid into said vessel at about said elastic limit.

Claims 11 and 14 are similar, including a recitation of plotting a single line record of pressure inside the vessel as a function of the volume of liquid introduced therein and "substantially instantaneously" signalling at the departure of that relationship from linearity, as determined from the plotted record. Claim 12 differs from claim 10 in only requiring introduction of liquid into the vessel until a "predetermined pressure" is reached, while claim 13 adds thereto the requirement that the introduction of liquid is "in no instance" continued past the first point where the pressure-volume record deviates from a straight line. The method is defined in claim 15 as for testing a pipe line.

## THE PRIOR ART

The references, relied on in somewhat different combinations in rejections of the various claims, are a French patent,[3] a British patent,[4] and domestic patents to Lathrop,[5] Kerr[6] and Van Horne.[7]

The French patent discloses a method of testing hollow bodies with a high pressure positive-displacement pump. The body is filled with liquid and the pump operated to increase the volume of liquid at a uniform rate thereby increasing the pressure in the body. In the disclosed technique, the pump is connected to a pressure measuring device and a mechanical graph which charts the change in pressure against the volume of fluid introduced into the test vessel. The test is to measure the operational efficiency

2. The application states
    The term "elastic limit," as used herein, refers to the greatest stress, i. e., load, which can be applied to a structure without leaving substantial permanent deformation therein upon complete release of the load.
    The term "yield point," as used herein, means the stress for which a marked increased strain occurs without a corresponding increase in stress.
    *       *       *       *       *
At the point wherein the change of internal pressure is no longer proportional to change in volume of fluid pumped into said vessel, the elastic limit has been reached.

3. French No. 528,456, granted August 17, 1921.

4. British No. 285,449, filed in 1927, specification open to public since prior to 1929.

5. No. 2,775,886, granted January 1, 1957.

6. No. 2,539,843, granted January 30, 1951.

7. No. 3,057,185, granted October 9, 1962, on an application filed February 6, 1961.

of the cylinder at some predetermined maximum pressure. The graph charts the P–V relationship while pressurizing and depressurizing the cylinder up to and from that maximum pressure. The amount of correspondence between the graph lines indicating pressure increase and decrease is an indication of the cylinder's performance.

The British patent describes a pressure test in which liquid is supplied to a hollow body. The test results in

determination of the pressure at which in spite of a supply of further testing liquid an increase of load does not more take place or at least in a very slow manner only.

The patent refers to use of recording gauges and to ascertaining the load from changes in the recording curve. The patent further states that the process involves "judging of the strength and the calculation of hollow bodies upon the yield-point of the material, instead of upon its strength." Subsequent heat treatment of the body is contemplated.

Lathrop relates to determination of the yield strength of materials by an "offset method," described as consisting of drawing the stress-strain diagram of a specimen and then drawing a line parallel to the usual linear range of the diagram at a selected offset distance from that portion with the yield strength corresponding to the point of intersection of the offset line with the plastic (curved) portion of the stress-strain diagram. As the material is subjected to gradually increasing stress in the test disclosed in the patent, means responsive to both the variations in applied stress and the resulting strain provide "the equivalent effect of drawing a stress-strain diagram." Upon the stress reaching the point where the stress-strain relationship varies from linearity by the amount preselected to represent the yield strength, the responsive means provides a signal to cause the operator to read the load or stress or to record it automatically. The patent states:

While our invention involves response to factors proportional to stress and strain, yet, in the broader aspects of our invention, these factors represent changing conditions which have an initial linear relation and a subsequent departure therefrom. Our apparatus automatically establishes the linear relation of one of these changing conditions to the other and also produces an indication automatically upon occurrence of a predetermined departure from the linear relation.

Kerr states that a steel pressure vessel subjected to stress below its elastic limits may expand slightly but will normally return to its original size when the pressure is released. It further states that when a vessel in weakened condition is subjected to high pressure, it undergoes expansion greater than normal and does not return to its original volume when pressure is released. The patent discloses testing a vessel by subjecting it to twice its rated working pressure and determining the permanent expansion after the pressure is released, with a value of greater than 10% regarded as an indication of unsatisfactory condition.

The Van Horne patent relates to nondestructive testing of a pressure vessel in which a record of the stress-strain relationship is made on a line recorder. A photo-electric trend detector is associated with the recorder to respond to the departure of the recorded line from a straight, or constant slope condition to operate cutoff and/or alarm means.

## THE REJECTIONS

Claims 10 and 15 stand rejected under 35 USC 103 as obvious in view of the French patent, the British patent and Lathrop; claims 11, 14 and 15 as obvious in view of the French patent and Van Horne; claim 12 as obvious in view of Kerr and the French patent; and claim 13 as obvious in view of Kerr and the French patent further in view of Lathrop and the British patent.

Since the rejection of claim 10 in view of the French patent, the British patent and Lathrop involves most of the issues here, we will direct our initial consideration primarily to that combination of references.

The examiner relied upon the French patent as teaching the following:

producing a graph (substantially instantaneously) of the pressure (stress) within a pressure vessel during a test as a function of the amount of liquid pumped into the vessel (strain).

Noting that it is "well known in the art that the elastic limit of any structure is that point at which the stress is no longer proportional to the strain" and that this "has been of great interest to engineers for years", the examiner stated:

The Lathrop et al patent shows that electro-mechanical devices have been developed for automatically responding when the elastic limit has been reached during a conventional stress-strain test. This device produces a signal which may be utilized for any desired purpose. The Lathrop et al device may be set up to produce a signal after whatever delay is considered desirable by the test engineer which includes no delay. The British patent shows that efforts have been made to determine the elastic limit of a pressure vessel during a pressure test and to discontinue the introduction of fluid into the vessel when it is clear that the elastic limit has been exceeded. The elastic limit might well have been substantially exceeded in using the crude measuring devices available when the invention of the British patent was made. The point is however that the test was discontinued when there was an indication that the elastic limit had been exceeded. Given the recording set up of the French

patent or other more sensitive instrumentalities such as the yield point detector of Lathrop et al it would be obvious to discontinue the test at the earliest opportunity after the elastic limit were detected.

The board sustained the rejection of all the claims for the reasons set forth by the examiner, and added:

Furthermore, we agree with the Examiner that, at this stage of the material testing art, it would be obvious to discontinue a stress-strain test at any desired point, such as at the elastic limit, or at the yield point, or to continue the test to the ultimate limit or rupture point. By way of example, Lathrop et al's apparatus is not limited to determining the offset yield strength, but it may automatically indicate the departure of the stress-strain function from a linear relation, i. e., the elastic limit, * * *.

## OPINION

Our analysis of the record before us, particularly the teachings of the prior art references and the position of the examiner and board with regard thereto as quoted above, taking into account appellants' arguments to the contrary,[8] has satisfied us that the Patent Office made no reversible error in refusing to allow claim 10. We are also satisfied that the analogy between the test requirements for a segment of pipe line to those for a hollow vessel would be apparent to one skilled in the art if for no other reason than the emphasis in the French patent in listing "pipes" as a form of "hollow bodies" to be tested by its procedure, and therefore sustain the rejection of claim 15 on the same references.

Turning to claims 11 and 14, we agree that it would be obvious to carry out the test in the French patent process to substantially the elastic limit for reasons

8. The fact that appellants regard departure from linearity of the stress (pressure)-strain (volume) relationship as indicative of the "elastic limit", when considered in light of their definitions as set out in note 2, demonstrates the absence of a clear distinction between their "elastic limit" and the "yield point" (British patent) or the "yield strength" (Lathrop).

which should be apparent from the discussion above. Also, the step of signalling when the desired test condition is reached is made obvious by Van Horne, which is admittedly available as a reference for this feature.[9]

Since Kerr suggests testing to a predetermined pressure as specified in claim 12, we are also convinced that rejection of that claim as obvious in view of that reference and the French patent was proper. Finally, the record before us indicates that the additional limitation in claim 13 that the predetermined pressure in the test of claim 12 is to be kept below the elastic limit defines only an obvious matter of choice.

The decision of the Board of Appeals is affirmed.

Affirmed.

9. Appellants' parent application, which was filed prior to it, does not disclose the signalling step. Therefore, the presently involved continuation-in-part application, filed more than one year after Van Horne issued, must stand on its own filing date as to that step.